UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

Criminal Case No. 21-20023
Honorable Linda V. Parker

COREY ALEXANDER MILLS,

    Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS (ECF NO. 30)

Defendant Corey Mills has been charged by Information with Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1).  The charge arises from a stop of Defendant by two City of Detroit police officers inside a liquor store on December 1, 2020.  Defendant now moves to suppress the firearm the officers uncovered during the stop, claiming it was seized in violation of the Fourth Amendment.

**Factual Background**

At around 11:30 p.m. on December 1, Officers Sequoia Turner and Carl Abion were on "a proactive patrol in a high crime area" when they entered a liquor store "for special attention."[1]  (ECF No. 35-3 at Pg ID 142; ECF No. 35-4 at Pg ID

---

[1] During the suppression hearing, Officer Turner provided that the area around the liquor store had a high crime rate but he was not aware of any specific incidents at the store where the officers encountered Defendant shopping.

143.) Officer Turner's body camera began recording as the officers exited their patrol car and continued to record throughout their subsequent arrest of Defendant. (ECF No. 35, Exs. 4, 6.) Due to a glitch, Officer Abion's camera was not activated until the point where Defendant was seized. (*Id.*, Exs. 5, 7.)

According to their testimony, Officer Turner has been a police officer with the City of Detroit for approximately eight years. Officer Abion has been an officer for two and a half years. Both officers have received training to identify when someone may be carrying a concealed firearm. This training taught them: (a) the shape to look for, (b) the primary locations where weapons are concealed, (c) how weapons move inside certain articles of clothing (i.e., a pendulum movement), and (d) the actions of a person trying to conceal a weapon (verbiage to distract the officer from the weapon, turning—referred to as "blading"—to conceal the area where the weapon is, and using the individual's hands to cover the object from view). The officers have encountered individuals carrying concealed weapons on a regular basis and their experience in the field is consistent with their training.

Defendant and his sister were inside the store when the officers arrived, standing at the counter to check out. Defendant was wearing a white and dark blue jacket, which appears to be a fairly thick down winter coat. He was smoking a cigarette when the officers entered the store, which is a civil infraction, and immediately extinguished it. According to Officer Turner, when the officers

arrived, Defendant already had checked out but, after whispering with his sister, they began asking the store clerk for additional items which were behind the counter. The video does not reflect any whispering between Defendant and his sister, and it is unclear that Defendant had completed other purchases before the officers entered the store or as they were arriving.

     As Defendant stood facing the counter, Officer Abion walked to Defendant's right side and stood about five feet away. Officer Turner remained near the store's front door. As another customer, wearing a black jacket, walked toward the exit, Officer Turner asked the man "that ain't no pistol in your pocket is it there?" To which the man indicated it was a cell phone and then pulled the phone from his pocket to show Officer Turner. The man left the store without incident.

     After observing Defendant for approximately 45 seconds, Officer Abion walked over to Officer Turner. Officer Abion can be heard saying to Officer Turner something like "right front, white jacket, jacket pocket." Officer Turner responded: "mmhmm," and then Officer Abion says, what sounds like, "I can't tell what it is." According to Officer Turner, Officer Abion indicated that he thought it was a gun but was not sure. Officer Abion testified that he "couldn't really tell" what was inside Defendant's pocket, he was "not really sure."

     Officer Abion then returned to Defendant's right side, moving closer to the counter to observe Defendant's right pocket from a better angle. Officer Abion

remained on Defendant's right side for approximately twenty seconds. During that time, Defendant's sister was standing about a foot or less to the right of Defendant at the counter, although Officer Abion testified that she was not blocking his view of Defendant's right jacket pocket.

According to Officer Abion, the pocket was weighed down and he could see two points. Officer Abion further testified that Defendant "got a little shaky" and turned his right side away from the officer and toward the counter (i.e., "blading"). None of this is evident in the video recording. Defendant remained standing square to the counter the entire time the officers observed him there.

Officer Abion then walked back towards Officer Turner, turning to Defendant and asking: "You say you got weed in your pocket?"[2] Defendant responded "Yeah" and briefly put his hand in his left jacket pocket. Defendant then collected the items he purchased and began walking toward the store's front door.

According to the officers, Defendant kept "his right side pressed up against the counter" as he walked towards the exit. Officer Turner testified that he could then see Defendant's right jacket pocket, which hung lower and was swinging. In his narrative report, Officer Turner wrote that when Defendant moved about, the fabric of his pocket revealed the shape of a pistol. (Officer Turner Report, ECF

---

[2] Defendant mentioned the marijuana while checking out at the counter.

No. 35-3 at Pg ID 142.)  At the suppression hearing, however, Officer Turner acknowledged that the item could have been something other than a gun.

Officer Turner then said to Defendant, "That ain't weed in the other pocket." Defendant responded, "No" and put his right hand into his right pants pocket.  The officers indicate that, with this movement, Defendant covered his front right jacket pocket with his right arm.  Officer Turner wrote in his report and testified that he believed Defendant was avoiding his right jacket pocket with this movement and was trying to conceal what was in the pocket from the officers' view.  Officer Turner then says, "No, your coat, your jacket right here," pointing and then saying, "that heavy thing."  Defendant asks, "heavy thing?" and then put his right hand into his right jacket pocket and left it there, saying, "Oh, that's a phone."  Officer Turner wrote in his report that Defendant kept his hand in the pocket to keep it from swinging and "appeared to struggle answering simple questions."  (ECF No. 35-3 at Pg ID 142.)

As Defendant continued to walk towards the store exit, past Officer Turner, Officer Turner told Defendant, "Take your hand out of your pocket," while grabbing Defendant's arm with one hand and putting his other hand on the exterior of Defendant's pocket and grabbing what in fact was a Glock 19 9mm handgun with 15 live rounds.

5

The officers then placed Defendant under arrest for carrying a concealed weapon.

## Parties' Arguments

Defendant moves to suppress the firearm, arguing that the officers lacked reasonable suspicion to detain and search him. Defendant maintains that the officers had nothing more than a hunch that there was a weapon in his jacket pocket, which does not support reasonable suspicion to stop or search him.

The Government maintains that the officers had reasonable suspicion of criminal activity to stop Defendant when (a) they encountered him inside a liquor store in a high crime area and (b) saw what they believed to be a handgun in his pocket. According to the Government, the officers' "suspicion was bolstered significantly" when Defendant (a) avoided his right jacket pocket when asked by the officers what was in there, (b) placed his hand in the right pocket of his pants and used his arm to conceal his jacket pocket from view, and (c) then put his hand in his jacket pocket and kept it there while walking past the officers. Until that point, the Government argues, the encounter between Defendant and the officers was consensual. It was only at that point that Officer Turner grabbed Defendant by the arm because he had a reasonable suspicion that Defendant was armed and dangerous.

## Applicable Law & Analysis

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons … against unreasonable searches and seizures." U.S. Const. amend. IV. A law enforcement officer's stop and frisk of a suspect—though potentially brief in duration—demonstrably infringes upon the suspect's liberty and thus constitutes a search and seizure for Fourth Amendment purposes. *See Terry v. Ohio*, 392 U.S. 1, 16 (1968) ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person. And ... a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is ... a 'search.' "). An officer may conduct a stop and frisk consistent with the Constitution "if two conditions are met." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009).

First, the investigatory stop must be lawful at its inception—i.e., justified by the requisite level of suspicion. *Id*. [P]ursuant to *Terry*, a warrantless encounter may be countenanced under the Fourth Amendment if an officer has reasonable suspicion that criminal activity may be afoot." *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008). "Reasonable suspicion 'requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard.'" *Id*. (quoting *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008)) (additional quotation marks and citation omitted). "[O]fficers [may] draw on their

7

own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* at 371 (quotation marks and citations omitted).

Second, before conducting a frisk, "the police officer must reasonably suspect that the person stopped is armed and dangerous." *Johnson*, 555 U.S. at 326-27. "The officer 'must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.'" *King v. United States*, 917 F.3d 409, 427 (6th Cir. 2019) (quoting *Sibron v. New York*, 392 U.S. 40, 64 (1968)). Whether there is reasonable suspicion to believe that an individual is armed and dangerous is an objective inquiry, *United States v. Noble*, 762 F.3d 509, 522 (6th Cir. 2014) (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)), dependent upon the "totality of the circumstances," *Id.* at 522 (citing *Joshua v. DeWitt*, 341 F.3d 430, 443 (6th Cir. 2003)).

For Fourth Amendment purposes, an officer seizes an individual "when the officer restrains the person's freedom of movement 'by means of physical force or a show of authority.'" *United States v. Lewis*, 843 F. App'x 683, 688 (6th Cir. 2021) (quoting *United States v. Mendenhall*, 446 U.S. 544, 553 (1980)). Stated differently, a seizure occurs "when a reasonable person would not believe he or she was free to leave or disregard the officer's requests." *Id.* (citing *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004)). To constitute a seizure, the

individual must actually surrender to the officer's show of authority. *Id.* (citing *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010)). "The question of when a seizure occurs is relevant because 'once a consensual encounter escalates to the point where the individual is 'seized,' the police officer must have a reasonable suspicion of criminal activity to justify a *Terry* stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment.'" *Id.* (quoting *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007)). "Examples of circumstances that indicate a seizure include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Id.* at 689 (quoting *Mendenhall*, 446 U.S. at 554). "Simple police questioning is insufficient to constitute a seizure." *Id.* (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).

Here, Defendant was seized when Officer Turner used one hand to grab Defendant's hand and the other to grab the outside of Defendant's jacket pocket. The Government contends that this seizure was lawful, citing several cases where courts found reasonable suspicion because the officers, in part, observed a bulge in the defendant's pocket that appeared to be a gun: *Lewis*, 843 F. App'x at 691;

9

*Pennsylvania v. Mimms*, 434 U.S. 106, 111-12 (1997); and, *United States v. Bell*, 572 F. App'x 417, 419 (6th Cir. 2014).

The officers in *Mimms* observed a bulge under the defendant's sports jacket after they stopped the defendant for driving with an expired license. 434 U.S. at 107. The Supreme Court held that this "permitted the officer to conclude that [the defendant] was armed and thus posed a serious and present danger to the safety of the officer." *Id*. at 112. Similarly in *Bell*, the Sixth Circuit affirmed the district court's denial of a motion to suppress where the officer saw a gun-shaped bulge in the defendant's pocket that, when asked whether he could see that it was a gun or was assuming it was a gun, the officer testified it "appeared to be a gun." 572 F. App'x at 419. Here, the Court does not find the officers' claimed observations regarding the object in Defendant's jacket pocket credible.

As an initial matter, the video does not reflect any of the nervous or suspicious behavior the officers say Defendant exhibited at the counter when the officers entered the store (e.g., stopping smiling, whispering with his sister, becoming a little shaky, turning his right side away from Officer Abion and toward the counter). Notably, none of this behavior is mentioned in their report. And some of the behavior Officer Turner described during his testimony (e.g., Defendant and his sister asking the store clerk for additional items after the officers arrived and Defendant extinguishing his cigarette) is not suspicious under the

10

circumstances. The video reflects that there were many products behind the counter for customers to purchase while checking out (i.e., "last-minute purchases").

Until Defendant began leaving the store, only his left side was visible to Officer Turner. Officer Abion, who did observe Defendant's right side, was unsure whether the object could be a gun. And while Officer Abion subsequently took another opportunity to view Defendant's right jacket pocket, he never conveyed to Officer Turner that he now believed the object inside was a gun and his subsequent report that he "observed a heavy object consistent with the shape of a handgun weighing down [Defendant's] front right jacket pocket" (ECF No. 35-2 at Pg ID 141) is not credible for the reasons discussed below, as well as the fact that Defendant's sister appeared to be blocking Officer Abion's view of Defendant's right side when the officer took his second look.

Officer Turner wrote in his report that he observed that Defendant's "right jacket pocket was weight [sic] and as he moved about the fabric of his pocket revealed the shape of a pistol." However, Defendant's right side was turned away from Officer Turner until Defendant began leaving the store. Even at that point, Officer Turner did not observe Defendant from an angle where the shape of the object inside his pocket would be revealed. And, according to the officers, Defendant kept his right side pressed to the counter while walking out of the store

11

to keep it from the officers' view.  Moreover, Defendant was wearing what appeared to be a puffy winter coat, which the Court believes likely insulated anything inside its pockets from view.  To the extent the pocket was weighed down—something not at all visible in the video—it as likely could have been a cell phone, a wallet, or car keys as it could have been a gun.

As indicated earlier, the Government maintains that there were other circumstances adding to the officers' reasonable suspicion.  First there is Defendant's putting his right hand in his right pants pocket and using his arm to—they believed—conceal his jacket pocket.  As the Government phrases it in its brief: "[Defendant] attempted to shield the pocket from their view by placing his hand in his pants pocket in an effort to obscure the view of the jacket pocket with his arm."  (ECF No. 35 at Pg ID 136.)  But certainly it was not suspicious for Defendant to reach into the pocket of his pants in response to the officers' statement:  "That ain't weed in the other pocket."  And, the video shows that the officers mischaracterize Defendant's movements.  When asked about "the other pocket," Defendant briefly reaches into his pants pocket and then removes it, as Officer Turner says "your jacket right there."  Defendant put his hand in his pants pocket before Officer Turner specified that he was asking about Defendant's jacket pocket.  In other words, Defendant's action of putting his hand in his pants pocket

did not reflect that he was intentionally attempting to shield his jacket pocket from the officers' view.

The officers claim that Defendant kept his right side pressed to the counter while he walked towards the exit. The Government says he did so to "keep[] the pocket where he had the gun obscured from the officers." (ECF No. 35 at Pg ID 131.) But this again does not describe what the video shows.

These circumstances are distinguishable from those in *Lewis*, which there combined to support the officers' reasonable suspicion that the defendant was armed. In *Lewis*, an officer came upon the defendant and another individual as they walked down an alley, which the officer knew was commonly used to evade police detection and trespass on neighboring properties. 843 F. App'x 685. The defendant's companion was known to the officer as a drug user who had stolen items from houses and trashcans. *Id*. The defendant had his hand in his pocket and, when the officer asked him to remove it, the defendant patted his waistband which, in the officer's experience, indicated he might be carrying a gun. *Id.* at 686. As the officer spoke with the companion, he noticed the defendant brush something small and white from behind his left ear and onto the ground, which the officer believed from his experience was some sort of contraband. *Id*. The defendant also was standing at an angle with his right hip away from the officer (i.e., "blading"), which the officer knew was a common stance for people carrying

guns. *Id*. The officer also noticed that the defendant had an "abnormally large bulge around his right hip"—where he had patted the waistband—which the officer believed could be a gun. *Id*.

When the officer asked the defendant his name, the defendant first provided a false name. *Id*. The officer asked the defendant if he was armed and defendant said no. *Id*. at 687. When the officer asked again, the defendant put his hands up. *Id*. Eventually officers found a loaded handgun in the waistband of the defendant's pants, at his right hip. *Id*. Defendant also had drugs and drug paraphernalia in his backpack, and a partially smoked marijuana joint was found on the ground where the officer saw him brush something from his ear. *Id*.

In upholding the district court's decision to deny the defendant's motion to suppress the handgun, the Sixth Circuit identified "multiple indicators" that Defendant may have been involved in criminal activity: (1) he "was in a high-crime area walking in an alley that people regularly used to avoid police detection and to trespass on neighboring properties"; (2) the officer saw the defendant brush an object from his ear onto the ground during their encounter which, from his experience, he suspected was drug evidence; (3) "[the defendant] was evasive when [the officer] asked for his name; (4) "there were several factors that indicated to [the officer] that [the defendant] may have been armed" such as the act of patting his right hip, the bulge in his waistband at his right hip (the same area he

14

patted earlier), and his standing in a "bladed position" with his right hip away from the officer. *Id*. at 690-91.

Here, Defendant was not in a suspicious location but was at a liquor store with his sister. Defendant did not dispose of an illegal substance in the officers' presence and he did not touch the pocket of his jacket while being obviously observed by the officers. Defendant also did not appear nervous in response to the officers' presence. Defendant did not provide the officers with false information and objectively was not "evasive." And contrary to what Officer Turner added in his report, Defendant never "struggle[ed] to answer simple questions." Defendant did not shift his position when the officers first entered the liquor store to conceal his right side from their view. In fact, he kept his right side to Officer Abion while waiting and paying for his purchases at the counter. To describe Defendant as standing in a "bladed position" is a mischaracterization.

The Government also notes the "stark contrast" between Defendant's response to the officers' questioning and that of the other store occupant who pulled his phone from his pocket to show Officer Turner what he was carrying. (ECF No. 35 at Pg ID 137.) Of course, Defendant was not legally required to show the officers what was inside his pocket. Further, Officer Turner specifically asked the other customer if he had a weapon in his pocket, whereas his "question" of Defendant was less exact ("that's no weed in your other pocket").

In any event, the Court finds that the two encounters reveal something different. The video shows only three customers in the store when the officers entered: Defendant and his sister and the man in the black jacket. Officer Turner stopped both men to investigate whether they were carrying weapons. Rather than truly having reasonable suspicion to believe that either individual was armed, the officers appear to have been targeting individuals who happened to be going about their business in a heavy crime area, without any basis for believing the individuals were illegally carrying weapons, with the hope of eventually catching someone who was.

In short, because the video recording of the incident undermines many of the officers' claims of what they observed before seizing Defendant—thereby rendering them not credible—the Court finds that the totality of the circumstances did not support a reasonable suspicion to conclude that Defendant was armed.

Accordingly,

**IT IS ORDERED** that Defendant's Motion to Suppress (ECF No. 30) is **GRANTED**.

**IT IS SO ORDERED.**

                                              s/ Linda V. Parker
                                              LINDA V. PARKER
                                              U.S. DISTRICT JUDGE

Dated: August 26, 2021